*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AJAY KUMAR BHARGAVA,

        Defendant-Appellant.

UNPUBLISHED
December 22, 2025
10:35 AM

No. 367369; 367373; 367376
Ingham Circuit Court
LC No. 19-000684-FH; 20-000412-FH; 20-000415-FH

Before: YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

Defendant, Ajay Kumar Bhargava, appeals his convictions of fourth-degree criminal sexual conduct, (CSC-IV), MCL 750.520e(1)(a), and second-degree criminal sexual conduct, (CSC-II), MCL 750.520c(1)(f). Bhargava argues that the trial court violated his constitutional right to a fair trial by not remedying juror misconduct, erroneously admitting expert testimony, and allowing prosecutorial misconduct. He also argues his trial counsel was ineffective. Finding no merit in the issues raised, we affirm Bhargava's convictions and sentences.

## I. FACTUAL AND PROCEDURAL HISTORY

Starting in 2018, following physical therapy appointments with Bhargava, several women came forward to a detective of the Meridian Township Police Department about what they believed were irregularities in the treatment they received from Bhargava. After two years of investigation, Bhargava was charged with five counts of CSC-IV and three counts of CSC-II. At Bhargava's 12-day jury trial, the complainants, former employees, and multiple experts testified.

Michelle Skover testified that she began seeing Bhargava at his physical therapy clinic in the summer of 2019, one month after a car accident, for injuries to her neck, her right shoulder down through her arm, and headaches. During her first few visits to Bhargava's office, Skover's therapy consisted of using exercise machines and tension bands in the common area, followed by application of an ice or heat pack to the affected areas, and ending with manual manipulation by Bhargava to her neck and shoulders. Skover was always fully clothed during the manual manipulation and Bhargava's hands never went under her clothes.

However, on her fourth and last visit to Bhargava, in the middle of June 2019, Skover testified that her treatment routine changed. At one point, Bhargava closed the door to the examination room, which he had never previously done. He then began rubbing Skover's lower back, below her clothes, just above the buttocks, pushing on different areas and asking her whether it hurt when he did that. Skover thought it was "strange" that Bhargava was rubbing this area because she was not there for treatment on that part of her body. Bhargava stopped massaging Skover's lower back and began to rub her neck with his hands. Bhargava's hands then moved under her shirt and around her collarbone, eventually ending up between her breasts, while asking her whether things hurt or felt better as he did so. He placed his hands inside Skover's bra strap, then inside her bra, touching her nipple and pushing on her breast tissue. At no time did Bhargava explain why he was manipulating this area of her body. At some point Bhargava stopped, walked around the front of the table, and leaned up against the windowsill while placing his hands over his genitals.

Another former patient of Bhargava's, Erica Villegas, testified that in 2019, she was receiving physical therapy from Bhargava at his clinic to treat pain in her shoulders and lower back. Her typical appointments with Bhargava would start with massages on her shoulders, then a "TENS" machine to her lower back and ending with some exercises. At an appointment with Bhargava in June 2019, her routine treatment changed.

At that appointment, Villegas recalled that Bhargava asked her to remove her bra because he needed to "access" a "different body part." Bhargava brought another woman, whom Villegas assumed was the receptionist, into the examination room with them to observe. Villegas testified that Bhargava was squeezing her breasts under her shirt with his hands as if he was massaging them. Bhargava had never previously touched Villegas in this way and did not explain why he was doing so this time. Villegas felt "uncomfortable" and just "wanted it to be over." Nevertheless, after this visit, Villegas continued to seek physical therapy from Bhargava to treat her pain. She "ignored what happened" and did not report the incident to anyone besides her boyfriend at the time. Bhargava never touched Villegas' breasts again at any other appointments. Sometime thereafter, Villegas read about allegations made against Bhargava. She called his office to cancel her upcoming appointments, never went back, and called the police to report the time that he touched her breasts without consent.

Stephanie Temple testified that she began treatment with Bhargava in 2009 for three months for a spinal injury. Temple returned in 2018 for treatment to the same part of her body. At her first appointment, Bhargava had her remove her shirt so he could see her spine. She testified that after taking off her shirt, Bhargava also unhooked her bra and traced up her spine with his finger. Bhargava's hands moved towards the sides of her ribs to touch the sides of her breasts. At her next appointment, Bhargava touched the sides of Temple's breasts again, this time while correcting her posture during exercising and not in the examination room. Temple treated with Bhargava once or twice more after this appointment and then did not return again. At the time, Temple had assumed Bhargava's touches were medically necessary for her treatment and not sexual. However, after reading an article about allegations made against Bhargava by other patients and discussing the incident with her psychiatrist, Temple decided to report her story to a detective.

Alyssa Coggins testified that she treated with Bhargava in March and April of 2012, and then again in December of 2012 to January of 2013. At either her second or third appointment, Coggins explained that she had more severe pain in her collarbone, so Bhargava asked her to remove her shirt and bra so that he could assess the area. He performed manual manipulation to her breasts. At the following sessions, Coggins testified, Bhargava would gradually do more manual manipulation to her breasts, neck, and shoulders. Although initially Bhargava would have another staff member in the room with him and Coggins during the manipulations, as he got "more comfortable," he would tell Coggins that no staff was available to sit in the room with them. Coggins testified that as the appointments progressed over time, Bhargava altered the way he touched her breasts, cupping instead of massaging them. Coggins took a few months off of visits and came back the following year with new pain in her sacrum.

Bhargava told Coggins he could help her with this pain, sent her into a private examination room, and asked her to undress fully. Coggins followed his instructions, taking off all her clothes except for her underwear and bra, and laid on the table underneath a sheet. Bhargava told Coggins that her bra would be in his way, so he unclasped it for her and asked her to lay face down. Coggins testified that Bhargava began massaging her neck and shoulders but then moved down to her lower back to her buttocks. While massaging that area, Bhargava's hands started moving down to massage Coggins' inner thighs, directly next to her vagina and touching her labia. Bhargava asked her to flip over onto her back and began massaging her shoulders again, while explaining to her that the breasts are connected to the abdominal muscles, which are connected the pelvis. Bhargava massaged her breasts, abdomen, and moved down to the crease of her leg, grazing her vagina with his hands. During this time, Coggins felt Bhargava's erect penis touching her head. When the session ended, Coggins got dressed and left and never returned for treatment. Coggins' husband noticed a distinct change in Coggins, wherein she was constantly cancelling doctor's appointments, and she began to not trust doctors.

Marie Wichtoski testified that she saw Bhargava to treat migraines and related shoulder tension in 2012 and 2013. Wichtoski's typical appointment would start with her using the TENS machine, then getting heat packs placed on her back, followed by stretching exercises for her back and neck. Bhargava would use his hands to correct Wichtoski's positioning and to place pressure on her upper back and neck while she did her stretches. Wichtoski testified that at her second to last appointment with Bhargava, instead of touching her back over her clothes like usual, Bhargava placed his hands under her shirt and bra and cupped her breasts. Wichtoski was not expecting Bhargava to touch her this way, as he had never done so before, did not warn her of what he was doing, and her eyes were closed at the time. She recalled tensing up when Bhargava cupped her breasts with his hands and then felt him remove his hands from her shirt. Wichtoski testified that she never returned to see Bhargava because she was touched inappropriately and did not want it to happen again. She also admitted on cross-examination that one reason she stopped treating with Bhargava was because of a billing dispute between her and his office. About seven years later, after seeing a news article about Bhargava, Wichtoski called the police to report her experience with him.

Tammy Munroe, Bhargava's former employee, testified that she worked for him for about six months while also seeing him as a patient for back pain. Munroe testified that during her first appointment with Bhargava, she was instructed to remove her shirt and bra, as well as her pants, leaving her only in her underwear, so that he could perform an examination of her symptoms.

Once the examination began, Bhargava told Munroe to remove the gown she had put on and to bend over so he could assess her spine. Bhargava moved behind Munroe, grabbed one of her breasts, moving it from one side to the other, and then did the same thing with her other breast. Bhargava next touched various areas of Munroe's back along her vertebrae, before finishing the assessment and recommending physical therapy.

An expert witness for the prosecution testified that massaging a female patient's breast could be appropriate in very limited situations when the patient has scar tissue in the breast area following surgery to the breast or if the patient has a lymphedema. She was unable to identify any other situation in which general orthopedic manual therapy to a patient's breast would be appropriate because "there is no muscle tissue in the breast." Manual treatment to the breast would require first performing a very specific evaluation to identify whether scar tissue existed in the area and would "involve special informed consent" of the patient. In that expert's review of the medical records associated with the complaining witnesses in this matter, she found no support for the use of breast massage. She also emphasized that "it is never okay to touch a patient's nipple" and that a "physical therapist would have zero reason to do that."

Detective Rebecca Payne of the Meridian Township Police Department testified that she investigated Coggins' sexual assault complaint against Bhargava in 2018. About a year later, Payne investigated allegations from Skover. Payne was eventually assigned to investigate Villegas', Temple's, and Wichtoski's allegations against Bhargava. During Payne's investigation of these complaints, she became aware of Munroe, a sixth woman who alleged Bhargava sexually assaulted her. Payne testified that after interviewing Munroe, the prosecutor decided not to press charges in connection with her allegations, as the statute of limitations in her case had expired. On cross-examination, she also acknowledged that the Meridian Township Police Department had issued a public apology for their handling of the Larry Nassar investigation on February 1, 2018, and that the first accusation against Bhargava occurred two weeks later.

During re-direct examination, Payne was asked whether, in sexual assault cases, it is common for an individual suspect to have more than one alleged victim. She testified, over defense counsel's objection, that in her experience, "it is common that a person who commits a sexual assault has not done that only to one person in their lifetime." Following Payne's testimony, the prosecution rested. The defense moved for a directed verdict, which was denied.

An expert witness for the defense testified that he reviewed the patient files at issue in this case and noted that nowhere in the records was there any indication that breast tissue massage occurred. He added that the use of manual manipulation therapy techniques near breast tissue is appropriate, and that each of these women's files had information in them which made the use of the technique appropriate. Several former employees testified for the defense, stating that they rarely saw doors closed in the treatment rooms and could not recall ever seeing anyone in a state of undress for treatment. Two former patients testified about their satisfaction with Bhargava's treatment and standard of care.

Bhargava took the stand on his own behalf and denied ever sexually assaulting any of the complainants. He testified that the only time patients were asked to undress or change clothing was when they would come in wearing work clothes and have to change into workout clothes, or when a patient needed an ultrasound that required wearing loose clothes, so their body was more

accessible. When changing was necessary, the patient would close the door to change and open it when they were finished. Bhargava never provided gowns or anything else for a patient to change into. Bhargava testified that while treating his patients, he would explain the techniques being used and would disclose which body parts he planned to work on. When Bhargava was asked about potential causes of neck problems in patients, he said there could be many causes, including tightness of the chest muscles. Bhargava denied ever touching the breasts of Skover, Coggins, Temple, Villegas or Wichtoski. And while he admitted that he could not rule out whether he touched Coggins' buttocks, he explained that if he had, it was done for a medical purpose in treating her lumbar condition. He also denied ever touching her pubic region or vagina. Bhargava also stated that he does not need to get special or written consent from a patient for working on sensitive areas.

Following Bhargava's testimony, the defense rested. The prosecution and defense presented closing arguments. Of relevance to Bhargava's claims on appeal, during closing, the prosecutor made the following statement to the jury:

> Now, [defense counsel] has been around for a while. He's an experienced defense attorney. You were able to see this in how he conducted his case. But he is also trying to make your job more difficult. He's trying to distract you.

Defense counsel made no objection to this statement.

Following jury instructions and three days of deliberations, the jury returned guilty verdicts as to one count each of CSC-IV relating to Skover and Wichtoski and two counts of CSC-II relating to Coggins, while acquitting Bhargava on all counts relating to Villegas and Temple. Bhargava was sentenced on May 30, 2023, to a minimum of one year and four months and a maximum of two years on the CSC-IV convictions and a minimum of three years and four month and a maximum of fifteen years on the CSC-II convictions to be served concurrent to one another.

Bhargava filed a motion for new trial with the trial court. In his motion, Bhargava claimed his right to an impartial jury was violated when a juror willfully and explicitly disregarded the court's instruction to not rely on information outside the evidence presented in court, and to not perform their own research. Specifically, he claimed that Juror 13 admitted to the prosecutor and defense counsel that she had done outside research on the news story concerning Larry Nassar and specifically focused on the timing of when it first aired, claiming that it impacted her decision with respect to Bhargava. The motion also argued Bhargava's right to a fair trial was violated when the trial court allowed Payne to provide unqualified expert opinion testimony. And finally, Bhargava's motion argued that the prosecutor's statement during closing argument that defense counsel was trying to "distract" the jury constituted prosecutorial misconduct and that defense counsel was ineffective for failing to object to this statement. The trial court scheduled an evidentiary hearing, which took place on December 9, 2024.

At the evidentiary hearing, Juror 13 testified that she had done outside research about when the original news story concerning Larry Nassar had first aired. When counsel asked Juror 13 what information she researched in relation to Nassar, she stated:

Okay. There's something you need to understand about me. I live an awfully like—like a hermit. I don't have a television, I don't have a computer, I barely can use my phone and the internet on my phone, and I listen to the radio maybe twice a month for a half hour. I get very little news. I knew very little about Nassar, but I did know he was in a case. I knew that there was something going on and so when I heard the testimony of the witnesses, especially the first one, Alyssa, when I heard her testimony, I was so convinced that this is just ridiculous. Her testimony to me was ridiculous and I thought this has got to be influenced by Nassar and if I'm going to—I remember thinking this to myself, if I am going to convince these people as much as I am convinced that this is just a Nassar look-alike, I got to find out—I mean, I got to know what Nassar looks like if I'm going to convince them that it's a Nassar look-alike. So I felt like they all have all of this background information because they have TV's, they have—they look at their computers, they have bombarded with stuff all the time. My house is very quiet. I don't have that stuff and so I thought, I've got to get up to speed. So I thought I would look it up, look up Nassar, and see if I can find—and I accidentally ran across this information about how these women went, I believe, on 60 Minutes and the story went nationwide. And that is when I found out about Nassar was when it went nationwide. Not because of 60 Minutes, but because I heard headlines on the radio. And so—do you want me to stop?

Juror 13 further clarified she was looking for a "timeline" as to when Nassar started getting media coverage compared to when the complaining witnesses in this case came forward. According to Juror 13, because she was under the assumption that Coggins had come forward in the day following the "60 Minutes interview," which would have corroborated Bhargava's theory that the Larry Nassar case influenced the proceedings of the investigation into Bhargava—she decided to look into the timing on when the Nassar news first aired. However, this "research" instead revealed that Coggins had come forward *prior* to the 60 Minutes interview. Juror 13 explained that her sharing her outside research with the other jurors apparently had no effect on their opinion, as they were quick to note the timeline did not support Juror 13's theory. She further testified that her ultimate decision to convict was not based solely on extraneous research, but that she was also persuaded in deliberations by two other jurors and after praying. Juror 13 testified that even if she had not looked up any information regarding Nassar, she would have still voted for a guilty verdict.

On January 21, 2025, the trial court issued its opinion and order denying Bhargava's motion for new trial. The opinion detailed its findings that (1) Juror 13's extraneous research did not deprive Bhargava of a fair trial, as the outside research did not influence the verdict, (2) Payne's testimony was not improper, and (3) the prosecutor's closing argument was not improper.

This appeal followed.

## II. ANALYSIS

The trial court denied Bhargava's motion for new trial that raised the same three issues he raises in this Court. We review that decision for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). A trial court abuses its discretion when it reaches a decision

"outside the range of reasonable and principled outcomes." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). The trial court's findings of fact are reviewed for clear error. Clear error occurs if "the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014).

## A. JUROR 13'S CONDUCT DID NOT AFFECT THE VERDICT

A defendant has a Sixth Amendment right to "trial [] by an impartial jury." US Const Am VI. During deliberations, jurors may only consider the evidence that is presented to them in open court. See *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997) (citation omitted). Where the jury considers extraneous facts not in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. *Id*. (citation omitted). Here, Bhargava presented evidence to the trial court that one juror had admitted to doing outside research. Once an individual establishes a "colorable claim of extraneous influence," the trial court must hold a *Remmer* hearing to determine prejudice. *Remmer v United States*, 347 US 227; 74 S Ct 450; 98 L Ed 654 (1954). The trial court did so.

To establish prejudice from a jury's consideration of extrinsic information, the defendant bears the initial burden. *Budzyn*, 456 Mich at 77. Bhargava needed to prove the jury "was exposed to extraneous influences" and that these extraneous influences created a real and substantial possibility that the influences could have affected the jury's verdict. *Id*. The Michigan Supreme Court has stated that generally a "real and substantial possibility" means that the extraneous influence must "substantially relate[] to a material aspect of the case" and there must exist "a direct connection between the extrinsic material and the adverse verdict." *Id*. at 89. If a defendant meets this initial test, the burden shifts to the prosecution to demonstrate that the error was harmless beyond a reasonable doubt. *Id*.

In its opinion denying Bhargava's motion for a new trial, the trial court held that Bhargava failed to show that any extraneous influence created a real and substantial possibility of affecting the jury's verdict. We agree.

To begin, we briefly revisit the extraneous information Juror 13 obtained. Juror 13 researched when a nationally-televised interview regarding the Larry Nassar case aired. After finding that information, Juror 13 then compared that date to the date one of the complainants came forward. When Juror 13 discovered that the complainant came forward before the Nassar program on 60 Minutes, Juror 13 found that particular complainant's testimony more believable. As a result, this extraneous research affected a juror's assessment of a complainant's credibility. That is a material aspect to any case, but particularly so for cases involving criminal sexual conduct allegations without physical evidence.

However, even though Juror 13 believed this information to be "extraneous," it is not entirely clear from the record that it in fact was. The Nassar case was brought up repeatedly by defense counsel to explain why a group of women may be motivated to come forward with these allegations. As to the particular complainant that concerned Juror 13, that complainant testified that "there was a lot of new media going on" about Nassar and that after she had her daughter she thought, "what in the world am I doing not reporting something like this because this could be her, it could be someone else." While the complainant did not contextualize when she came forward

-7-

with the timing of the 60 Minutes story in particular, she testified that the news coverage of the Nassar case in general motivated her to speak to police.

But, even accepting that the information was extraneous, the evidence presented at the evidentiary hearing confirms that Juror 13's research did not affect the jury's verdict. At the evidentiary hearing, the testifying jurors reported under oath that the research conducted and shared by Juror 13 did not affect the verdict. The other jurors immediately silenced Juror 13 when she attempted to present her findings, and Juror 13 even testified that she would have voted guilty regardless of what she discovered. Specifically, when asked what factors influenced her decision, Juror 13 testified that she was persuaded not only by her outside research, but by two other jurors and revelations gained through prayer.

> On the jury, jury number four—juror fourteen . . . she took—okay, there was a —there was a [complainant], and in my opinion, she was whacky. Felt like she was ridiculous to me and I—I saw her testimony in an entirely different light than [Juror 14] did. And so [Juror 14] took her testimony and explained it to me the way she understood it, and that made a big difference.

Juror 13 also testified that she was influenced by another juror, too. She explained:

> And another reason . . . , I don't remember what juror number he is, but [he] is here today and I was very impressed with [him] because he told me that his job was to go into houses and help people with their troubled teenagers. And talking to him and just his persona, I felt that this guy really knows human nature. He really understands women and when I ask him point blank, ". . . what do you think," and his—his guilty was so assured. I mean, he was totally convinced that he—that [Bhargava] was guilty and I think that it reinforced my—when I had switched.

Finally, Juror 13 testified that she was influenced to convict Bhargava through personal prayer:

> I—oh, it's a big one, here I am. I prayed about it, okay? I prayed about it and I—I had some very good friends pray with me about it and I prayed. I said, God, you have got to tell me why do I believe this Doctor and I do not believe these six women? And I have had answers from God before and I knew I would have an answer. And I said, I've got to have an answer tonight, we have got to settle this tomorrow. And so I went to sleep. I was kind of excited. I thought, yes, I'm going to hear voices, I'm going to see lights, I'm gonna hear bells, I don't know what's going to happen, you know? But I—one o'clock in the morning, I jerked awake and my eyes flew open and I thought, because women are not believed. And that's such a strange answer, that would not come from me, I knew that was God.

Juror 13 again confirmed that she would have voted for a guilty verdict regardless of her research:

> I probably would've still voted guilty because of the perspective that Amy gave me and something happened to me when she told me that. Something, like broke. Something felt like, I am wrong. I've gotta—I've gotta look at this more carefully.

I—I am so determined that this is just a Nassar look-alike, I had better take another look. And I—I think that that was so effective that I think I still would've had to say guilty.

Based on Juror 13's own testimony under oath, as well as the testimony of the other jurors at the evidentiary hearing, it is clear that her outside research into the Nassar case did not create a real and substantial possibility that the research influenced the jury's ultimate verdict. Bhargava has failed to meet his burden and is not entitled to relief on this issue.

## B. PAYNE'S ERRONEOUSLY-ADMITTED TESTIMONY DID NOT AFFECT THE OUTCOME AT TRIAL

Bhargava next argues he was denied his right to a fair trial because the trial court admitted unqualified expert testimony. Specifically, Bhargava takes issue with the portion of Payne's testimony on re-direct examination when the prosecutor asked her if it is common for a suspect to have more than one alleged victim in sexual assault cases. Payne testified:

> *Prosecutor*: Okay. Is it common or uncommon in your experience in doing sexual assault cases for an individual suspect to have more than one alleged victim?

> *Payne*: It's quite common. We don't always—

> *Defense counsel*: Objection, your Honor. This is prejudicial towards him. It's also not relevant what other accusations are in other cases.

> *Prosecutor*: Well, your Honor, it was specifically asked in cross-examination with regard to Alyssa Coggins's case being issued after another victim came forward. And I'm just exploring whether or not that it is usual or unusual in this field.

> *Defense counsel*: Your Honor, I think it's bordering on trying to ask for expert testimony about the patterns of individuals accused.

> *The Court*: Well, she didn't ask for a pattern. She's just saying has it occurred. So on that limited basis I would overrule the objection and allow the answer.

> *Payne*: In my experience—or in the investigations that I have completed it is common that a person who commits a sexual assault has not done that only to one person in their lifetime.

Bhargava claims that Payne's testimony was improper testimony under MRE 701 because it invaded the province of the jury by embracing an ultimate issue that the jury was fully competent to determine. He also argues that this testimony was improper lay opinion, as it was based on Payne's training and experience as a police officer, and as such, required the prosecutor to have her qualified as an expert under MRE 702.

MRE 701 provides that opinion testimony by a lay witness "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Opinion testimony from a lay witness does "not involve highly specialized knowledge" and is "largely based on common sense." *People v McLaughlin*, 258 Mich App 635, 658; 672 NW2d 860 (2003). MRE 702 provides for the admission of opinion testimony by an expert. MRE 702 permits opinion testimony from an expert where:

[I]t is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The first question is whether, by citing to her "experience," Payne was actually offering expert, not lay, testimony. Police officers routinely testify as to their general experiences without needing to be qualified as experts. See *Chastain v Gen Motors Corp* (*On Remand*), 254 Mich App 576, 588; 657 NW2d 804 (2002) (permitting a police officer to give lay opinion testimony under MRE 701 that the plaintiff was not wearing his seatbelt based on the officer's perception of the scene); *Co-Jo, Inc v Strand*, 226 Mich App 108, 117; 572 NW2d 251 (1997) (fireman's opinion testimony regarding the speed at which a building burned was properly admitted as lay opinion testimony under MRE 701 where "the testimony was of a general nature, without any reference to technical comparison or scientific analysis"). Here, though, unlike the *Chastain* and *Co-Jo* cases, where lay officers were testifying as to their "perceptions at the scene of an accident," Payne's testimony was a retrospective on her entire career, and drawing a conclusion therefrom, not an observation of a particular scene or singular moment. *People v Dobek*, 274 Mich App 58, 78; 732 NW2d 546 (2007). However, to the extent that this testimony required "specialized knowledge" under MRE 702, Payne was qualified to give it. She testified about her career, beginning in 2004, her specialized training in handling sexual assault cases, and that since 2016 she has exclusively handled sexual assault cases. She went on to testify that she estimates she has investigated 400 to 600 sexual assault cases in her career.

Next, we consider whether the testimony was, as trial defense counsel also alleged, more prejudicial than probative. It is difficult to identify any probative value in testifying as to the frequency with which sexual assaulters are serial. Even if there is minimum probative value, it is arguably substantially outweighed by the unfair prejudice it caused Bhargava.

But, assuming the evidence was erroneously admitted, its admission was not outcome-determinative and does not entitle Bhargava to appellate relief. *People v Dixon-Bey*, 321 Mich App 490, 511; 909 NW2d 458 (2017). Appellate defense counsel argues that the prejudice from this erroneously-admitted evidence is apparent on the record because Bhargava was convicted on multiple counts "absent credible testimony from witnesses like Ms. Coggins and Ms. Villegas."

But an appellate court will not interfere with the jury's role in determining credibility and weight of the evidence. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended on other grounds, 441 Mich 1201 (1992). After twelve days of trial and considering all the other testifying witnesses, including six accusers, the jury found some complainants to be credible and others not. A review of the record as a whole leaves no doubt that this single statement by Payne did not more probably than not affect the outcome of trial.

## C. BHARGAVA FAILS TO ESTABLISH ANY PROSECUTORIAL MISCONDUCT OR INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of prosecutorial misconduct are reviewed on a case-by-case basis. *People v Kelly*, 231 Mich App 627, 637; 588 NW2d 480 (1998). "The propriety of a prosecutor's remarks depends on all the facts of the case." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. *People v Brown*, 267 Mich App 141, 152; 703 NW2d 230 (2005).

Although Bhargava did not object to the prosecutor's closing at trial, his appeal takes issue with the following statement made during closing argument:

> Now, [defense counsel] has been around for a while. He's an experienced defense attorney. You were able to see this in how he conducted his case. But he is also trying to make your job more difficult. He's trying to distract you.

Bhargava claims that when the prosecution said defense counsel was trying to "distract" the jury, it "exceeded the bounds of fair argument by disparaging Dr. Bhargava's trial counsel" and "the role he plays in the trial."

Prosecutors are afforded great latitude regarding their arguments and conduct at trial. *People v Fyda*, 288 Mich App 446, 462; 793 NW2d 712 (2010). In *Fyda*, this Court found no prosecutorial misconduct where, like here, the prosecution repeatedly characterized the defense's arguments as a "distraction." This Court stated, "although the prosecutor here repeatedly characterized the defense's arguments as a distraction, the prosecutor was not suggesting that defense counsel did not believe Fyda." Instead, this Court recognized that "the prosecutor's comments properly addressed the weaknesses of Fyda's theory of defense—that is, its singular focus on discrediting [a witness]." *Id*.

Here, the prosecutor's comment followed defense counsel's closing that made mention of the lack of dressing gowns recovered and the position of the operating tables and their mobility. The prosecutor's isolated comment reminded the jury that inconsistencies between staff testimony regarding the use of towels, whether the door remained open, and chaperones in the exam room, were "distractions" from the ultimate question to the jury: whether Bhargava was guilty or innocent. As recognized by the trial court in denying Bhargava's motion for a new trial, "[b]oth parties are free to ask juries to focus on specific portions of evidence over others, and characterizing [the prosecution] focusing on the gowns is fully within the latitude afforded to closing arguments." Further, we consider the brevity of the comment, and that it was made in

response to Bhargava's focus on gowns throughout the trial. *Fyda*, 288 Mich at 462 ("When a defendant advances a theory, the prosecutor may argue the inferences flowing from that theory.").

In the alternative, Bhargava argues that defense counsel's failure to object to the aforementioned comment rendered counsel ineffective. This too lacks merit. Because we find no misconduct on behalf of the prosecution during closing argument, we cannot say that counsel was ineffective for failing to object to the prosecutor's comment. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Affirmed.

/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young